1

2

3

4                              UNITED STATES DISTRICT COURT

5                                    DISTRICT OF NEVADA

6                                            * * *

7    FIRST 100, LLC, *et al.*,                        Case No. 2:16-cv-00099-RFB-CWH

8                              Plaintiff,

9           v.

10   OMNI FINANCIAL, LLC, *et al.*,

11                             Defendants.

12   ───────────────────────────────────

13   KAL-MOR-USA LLC and GFY                           Case No. 2:16-cv-00109-RFB-CWH
     MANAGEMENT LLC,
14                                                             **ORDER**
                             Plaintiffs,
15
     v.
16
     OMNI FINANCIAL, LLC, *et al.*,
17
                             Defendants.
18

19          **I.      BACKGROUND**

20          This case is before the Court on two Motions for Preliminary Injunction. The first was

21   filed by Plaintiffs First 100, LLC and 1st One Hundred Holdings, LLC (collectively, "First 100")

22   on January 27, 2016 in case no. 2:16-cv-00099. ECF No. 16. In its motion, First 100 seeks to

23   enjoin Defendants Omni Financial, LLC ("Omni") and PrenPoinciana, LLC ("PrenPoinciana")

24   from foreclosing on First 100's assets, including certain beneficial interests in proceeds realized

25   from homeowners association (HOA) accounts receivable, at a scheduled UCC sale of collateral.

26   The second preliminary injunction motion was filed by Plaintiffs Kal-Mor-USA, LLC ("Kal-

27   Mor") and GFY Management LLC ("GFY") on April 27, 2016 in case no. 2:16-cv-00109. ECF

28   No. 13. Kal-Mor and GFY also seek to enjoin Omni and PrenPoinciana from conducting the

scheduled foreclosure sale. Kal-Mor and GFY claim that the scheduled sale includes assets that belong to them which they purchased in reliance on an earlier settlement agreement entered into between the parties in open court on February 2, 2016 ("February 2 settlement agreement").

Plaintiffs in both cases have also filed other related motions. In case no. 16-cv-00099, First 100 filed a Motion to Enforce Settlement Agreement, claiming that the parties in both cases entered into a binding settlement agreement on February 2, 2016 and that Omni and PrenPoinciana's noticing of a foreclosure sale is a breach of that agreement. ECF No. 44. In case no. 16-cv-00109, Kal-Mor and GFY filed a Motion to Amend Complaint seeking to add new causes of action arising out of Defendants' alleged breach of the purported February 2 settlement agreement. ECF No. 11. The Court granted Kal-Mor and GFY's Motion to Amend Complaint in open court on May 11, 2016.

First 100 initially brought this action in Nevada state court seeking to enjoin Defendants' foreclosure sale of First 100's assets. The case was removed to this Court on January 18, 2016, and First 100 filed an Emergency Motion for Temporary Restraining Order one day later.[1] ECF Nos. 1, 2. Also on January 20, 2016, the Court held a hearing and issued a Temporary Restraining Order (1) enjoining Defendants from conducting a foreclosure sale on any property belonging to First 100 and (2) preventing First 100 from selling, encumbering, or otherwise disposing of any of their interests in HOA accounts receivable at issue in this litigation. ECF Nos. 11, 12. First 100 subsequently filed its Motion for Preliminary Injunction, the hearing of which was postponed several times to allow the parties to pursue settlement and to retain expert witnesses to testify as to the valuation of the HOA accounts receivable at issue in this case. ECF Nos. 36, 41, 58. The Court held a hearing on Plaintiffs' preliminary injunction motions over three days from May 11, 2016 to May 13, 2016.

For the reasons discussed below, the Court finds that First 100, Kal-Mor, and GFY have not established the elements necessary for a preliminary injunction, nor have they shown that the parties entered into a binding contract on February 2, 2016. Therefore, the Court denies the

---

[1] Kal-Mor joined in First 100's Motion for Temporary Restraining Order on January 20, 2016. ECF No. 8.

1  parties' motions for preliminary injunction and First 100's Motion to Enforce Settlement

2  Agreement.

3

4  **II.    FINDINGS OF FACT**

5      Based on its review of the evidence submitted at the preliminary injunction hearing, the

6  Court makes the following factual findings.

7  **A.  First 100's Acquisition of 2013 Receivables**

8      1.      First 100 is a real estate investment company that operates through acquiring

9  rights to future cash flows from delinquent HOA assessment account receivables and by

10  purchasing real property at HOA foreclosure sales.

11     2.      On July 3, 2013, First 100 entered into a Purchase and Sale Agreement with the

12  Association of Poinciana Villages, Inc. (APV), a Florida HOA comprised of approximately

13  30,000 homes. Pursuant to the Purchase and Sale Agreement, First 100 purchased from APV the

14  right to receive all payments of delinquent HOA assessments owed to APV for 3,417 units. The

15  Court will refer to this beneficial interest in the accounts receivable as the **2013 Receivables**.

16     3.      According to the Purchase and Sale Agreement, APV agreed to pursue

17  foreclosure proceedings against select properties with delinquent assessment accounts that were

18  sold to First 100. APV also granted a limited power of attorney to First 100 to hire legal counsel

19  to represent APV in foreclosure proceedings on those properties and authorized First 100 and its

20  chosen counsel to act on APV's behalf with respect to offers to pay off delinquent assessments

21  for properties placed into foreclosure proceedings.

22  **B.  Omni Loan Agreement**

23     4.      On May 27, 2014, Omni and First 100 entered into a Loan Agreement through

24  which Omni agreed to loan a maximum of $5,000,000 to First 100 (the "Omni Loan").

25     5.      The Omni Loan was purportedly secured according to the terms of a Security

26  Agreement entered into by the parties on May 27, 2014. According to the Security Agreement,

27  First 100 granted Omni a security interest in the "Collateral," which was defined in the

28  agreement as "all of [First 100's] present and future right, title and interest in and to any and all

of the personal property of [First 100], whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time." Security Agreement § 1.2, Omni Ex. 5. Among other things, the definition of "collateral" specifically includes accounts, payment intangibles, "the HOA Receivables identified on 'Schedule A' hereto" (the 2013 Receivables), and "all Accessions to and Proceeds and products of the foregoing." Id. If First 100 defaulted in its repayment obligations, the Security Agreement authorized Omni to accelerate the total amount due and to foreclose on the collateral. Id. § 5.2.

6.      Several members of First 100 also executed personal guaranties in favor of Omni as additional security for Omni's loan to First 100.

7.      First 100 subsequently defaulted on its repayment obligations under the Loan Agreement and remains in default. To date, the total balance owed to Omni by First 100 under the Loan Agreement is $3.5 million. This finding is based on the affidavit of Jay Bloom, director of First 100, filed in connection with First 100's original Motion for Temporary Restraining Order, as well as the testimony presented at the preliminary injunction hearing.

8.      First 100 and Omni entered into a Forbearance Agreement on December 18, 2015, which was amended on December 21, 2015, in which they agreed that Omni would not take action at that time to foreclose on the collateral identified in the Security Agreement.

9.      As consideration for Omni's forbearance, the Forbearance Agreement states that First 100 was to make a payment of $270,500 within five business days of the effective date of the agreement. The Forbearance Agreement also states that "[t]he making of such payment shall be a condition precedent to [First 100] being entitled to the forbearance herein." Forbearance Agreement at 4, First 100 Ex. 13.

10.     The Forbearance Agreement states that it is not effective until all conditions precedent to forbearance have been fully satisfied, including First 100's requirement to make the $270,500 payment. Id. at 1.

11.     First 100 did not make the $270,500 payment to Omni as required by the Forbearance Agreement.

**C. Agreement With PrenPoinciana**

- 4 -

12.     On February 2, 2015, PrenPoinciana and First 100 entered into a Proceeds Purchase and Sharing Agreement ("First PPSA"). The First PPSA states that PrenPoinciana purchased from First 100—"free and clear of any lien, claim, . . . security interest, equity, restriction or other encumbrance"—the right to receive a percentage of any proceeds realized from the 2013 Receivables, including money received from the collection of any delinquent assessments, the sale of the liens, or the sale or rental of any foreclosed properties attached to those delinquent accounts. First PPSA § 1(a), PrenPoinciana Ex. A. By the terms of the First PPSA, the percentage of 2013 Receivable proceeds allocated to PrenPoinciana would begin at 100% and would decrease as the aggregate amount paid to PrenPoinciana hit certain thresholds. PrenPoinciana paid a purchase price of $1,000,000 to First 100 for the right to receive these proceeds.

13.     First 100 made several covenants and acknowledgements to PrenPoinciana in the First PPSA. Relevant to this case, First 100 agreed that it would not (without PrenPoinciana's prior written approval) transfer, assign, dispose of, or further encumber its beneficial interest in the 2013 Receivables, any properties secured by the 2013 liens that were subsequently foreclosed upon by First 100, "or any other assets" of First 100. Id. § 6(c)(1), (3). First 100 also agreed that it would not "[i]ncur any additional borrowed money indebtedness or guarantee any borrowed money indebtedness of any other Person" except for certain payments from Omni. Id. § 6(c)(2).

14.     The First PPSA also contains a section that grants a security interest in favor of PrenPoinciana to secure First 100's obligations under the agreement. According to this section, First 100 granted PrenPoinciana "a second lien security interest in, and lien, claim and encumbrance on" the 2013 Receivables. Id. § 2(e). The PPSA states that this security interest was to be subordinate to Omni's security interest in the 2013 Receivables granted under the Omni Loan Agreement. Id. The First PPSA also states that First 100 authorized PrenPoinciana "to file any UCC-1 financing statements and to take any other action necessary to perfect the security interest granted . . . above." Id.

**D. Agreement With Prentice**

15.     On April 20, 2015, First 100 executed a Secured Short Term Original Issue

- 5 -

Discount Promissory Note ("Prentice Note") in favor of Prentice Lending II, LLC. The Prentice Note states that First 100 agreed to pay a sum of $150,000 to Prentice by a certain date as repayment for a loan from Prentice to First 100. The sum due to Prentice was increased to approximately $162,000 in an amendment to the Prentice Note entered into on May 14, 2015.

16.     The Prentice Note states that First 100 agreed to place fully-executed deeds to four parcels of real estate in trust for Prentice's benefit as security for First 100's repayment obligation. The May 14 amendment to the note states that Prentice would have the right to record the deeds provided "to satisfy all amounts outstanding under the Note." Amendment No. 1 to Prentice Note § 3, PrenPoinciana Ex. F.

17.     The Prentice Note also states that it is secured by First 100's right to receive payments from the 2013 Receivables under the First PPSA and a subsequent Payment Arrangement Agreement entered into by First 100, Omni, PrenPoinciana, and McCabe Law Group, P.A. (legal counsel charged with collecting payments on the 2013 Receivables in Florida).

18.     First 100 tendered four quitclaim deeds to the parcels of real property to Prentice. It is unknown whether Prentice recorded the deeds. First 100 has not otherwise satisfied its repayment obligations under the Prentice Note.

**E.  February 2, 2016 Settlement Negotiations**

19.     The Court held a hearing on First 100's Motion for Preliminary Injunction on February 2, 2016. At the hearing, the parties advised the Court that they had reached a settlement after several hours of negotiations.

20.     Counsel for Omni then read several terms of the parties' agreement into the record, and all parties appeared to agree to those terms. Counsel for Omni stated that the parties intended for the terms read into the record "to be an enforceable contract . . . but then to follow-up with an agreement that might give a little more detail." Tr. at 12:17-19, ECF No. 37.

21.     Among the terms agreed to by the parties at the February 2 hearing were that: (i) the foreclosure sale noticed by Omni and PrenPoinciana would be cancelled; (ii) all of First 100's interest in the 2013 Receivables would transfer to Omni; (iii) Omni would assume

management and control of the HOA lien portfolio and would serve as the sole liaison to Mr. McCabe, who was the counsel servicing and collecting on the APV liens in Florida; (iv) proceeds from the HOA receivables would be distributed according to a "waterfall," pursuant to which the proceeds would first flow to Omni until it was repaid in full, then partially to Omni and partially to PrenPoinciana until certain thresholds were met, and then would continue to be divided among Omni, PrenPoinciana, First 100, and Kal-Mor at varying percentages; and (v) First 100 would place the rents and other revenue from four parcels of Nevada real property into the waterfall.

22.     Additionally, the parties agreed at the February 2 hearing that First 100 had previously agreed to purchase from APV the right to receive proceeds from delinquent assessment account receivables for the years 2014 and 2015 (the "2014-15 Receivables"), but had not yet provided the funding for that purchase.

23.     The parties further agreed that any funding of the 2014-15 Receivable purchase by First 100, Kal-Mor, or another party associated with this agreement between the parties must take place within 30 days. If this occurred, First 100 would receive the proceeds from the assessments in an amount of $252 per year per home. The remainder of the proceeds, such as late fees, interest, collection costs, and attorney's fees, would flow into the waterfall.

24.     Finally, the parties agreed that if First 100 was found to have a binding contract with APV to purchase the 2014-15 Receivables and was found to be in breach of that contract, First 100 would be solely liable for that breach.

25.     Although the parties informed the Court that they intended to draft and file a formal written settlement document, they were unable to reach agreement on that document. The parties then participated in a consolidated hearing on First 100 and Kal-Mor's preliminary injunction motions on May 11-13, 2016.

### F.  GFY's Purchase of the 2014-15 Receivables

26.     In January 2016, Greg Darroch, managing member of Kal-Mor, began discussions with First 100 regarding a potential agreement whereby Darroch would provide funding for the purchase of the 2014-15 Receivables from APV.

27.     The purchase of the 2014-15 Receivables had already been agreed to between APV and First 100 in November 2015. According to the terms of the agreement between APV and First 100, the 2014-15 Receivables were to be sold to First 100 as of October 30, 2015, with First 100's payment of the sale price due by November 30, 2015. However, First 100 never paid the sale price to APV.

28.     On January 20, 2016—which was approximately the same date that First 100 and Darroch began discussions regarding the funding of the 2014-15 Receivables—the Court issued a Temporary Restraining Order directing First 100 not to "sell, encumber, or otherwise dispose of any of the interests in HOA accounts receivable they may possess that are at issue in this litigation." ECF No. 11.

29.     Subsequently, during the February 2, 2016 hearing, the parties read their proposed settlement agreement into the record. Darroch participated telephonically at the February 2 hearing. As stated above, the parties—including First 100, Kal-Mor and Darroch—agreed that if funding for the 2014-15 Receivables were provided to APV by First 100, Kal-Mor, or another party, First 100 would receive the proceeds from the assessments in an amount of $252 per year per home. The remainder of the proceeds, such as late fees, interest, collection costs, and attorney's fees, would flow into the waterfall. There was no discussion at the February 2 hearing of any party other than First 100 taking title to the 2014-15 Receivables.

30.     Throughout February and March, First 100, Kal-Mor, Omni, and PrenPoinciana continued to negotiate the terms of a comprehensive written settlement agreement. First 100 and Darroch also continued discussions relating to Darroch's purchase of the 2014-15 Receivables. During these negotiations, First 100 never informed Darroch that First 100 had been ordered by the Court not to sell or encumber any HOA accounts receivable in their possession. However, Darroch was on notice of this order because it was sent to his counsel.

31.     Darroch and co-owner Phil Burasso created GFY as a special-purpose entity to complete the purchase of the 2014-15 Receivables. Burasso was not a party to the purported February 2 settlement agreement, nor did he participate in those negotiations.

32.     On March 11, 2016, counsel for Omni sent a letter to counsel for First 100, Kal-

Mor, and GFY. The letter stated that the parties had exchanged several drafts of a written settlement agreement, but that after a four-hour telephone conference on March 4, 2016, "there were still 18 unresolved issues, most of which involve centrally important issues." PrenPoinciana Ex. Y. The letter stated that Omni's counsel was enclosing a proposed written settlement agreement and that if it was not executed and returned by March 17, 2016, counsel would inform the Court of Omni's position that settlement negotiations were dead.

33.     On March 15, 2016, Darroch informed Martin Boone, managing member of Omni, that the 2014-15 Receivables would be funded by March 18.

34.     On March 16, 2016, Darroch informed Boone that Darroch's lender would not provide the anticipated funding unless the settlement agreement was signed. The proposed settlement agreement was not signed.

35.     On March 17, 2016, GFY and First 100 entered into a Proceeds Purchase and Sharing Agreement ("Second PPSA"). The Second PPSA states that GFY purchased all of First 100's rights to and interest in proceeds realized from the 2013 Receivables, the 2014-15 Receivables, and assessments due on one thousand additional APV properties through December 31, 2015.  This Second PPSA did not indicate that it was intended be incorporated into any "Settlement Agreement" or that it was meant to be subordinate to any beneficial interests of Omni or PrenPoinciana.

36.     On March 18, 2016, Darroch, on behalf of GFY, wired approximately $710,000 to APV as payment for the 2014-15 Receivables.

37.     GFY purchased the 2014-15 Receivables in reliance on the Second PPSA it entered into with First 100, not on the purported February 2 settlement agreement. This finding is based upon the overall circumstances, timing and wording of the Second PPSA as well as the Court's finding that Darroch would not have wired the $710,000 to APV in the absence of the signed Second PPSA. It is also based on the fact that GFY was co-owned by Burasso, who was not a party to the settlement negotiations, as well as the fact that the Second PPSA contains additional terms beneficial to GFY that were not outlined at the February 2 hearing.

38.     The Court also finds that Kal-Mor and GFY intentionally withheld the Second

PPSA from Omni and PrenPoinciana during the discovery and proceedings in this case despite knowing that it should have been produced and that it was clearly relevant to the disputed issues in this case.

### G.  Valuation of 2013 and 2014-15 Receivables

39.     The face value of the 2013 and 2014-15 Receivables (collectively, the "Lien Portfolio")—which reflects assessments, late fees, interest, attorney's fees and costs, and administrative fees—is approximately $5.23 million.

40.     At the May 11 preliminary injunction hearing, the Court heard testimony from Jay Bloom, director of First 100, and Leigh Katzman, an attorney licensed in the state of Florida. Both witnesses testified to their opinion of the value of the Lien Portfolio.

41.     Mr. Bloom testified that the value of the portfolio is no less than $5 million and no more than $227 million, with an expected value of $59 million. This testimony was based on Mr. Bloom's opinion that some liens would be paid off at face value and that First 100 would take title to the properties attached to the liens that were not paid off. First 100 would then sell or rent out those properties, generating revenue much greater than the face value of each individual lien.

42.     The Court does not find Mr. Bloom's testimony regarding valuation of the Lien Portfolio to be credible. Mr. Bloom is not licensed to practice law in Florida and identified no legal authority by which a Florida HOA would be able to extinguish a bank's first-priority mortgage and thereby take title to a property free and clear of the mortgage. Additionally, as discussed in more detail below, the Court finds no basis for such a procedure in Florida law. While Mr. Bloom testified that First 100 could derive significant value from acquiring properties in the Lien Portfolio at foreclosure sales and renting them out or selling them, First 100 has not *actually* foreclosed on a single property listed in the Lien Portfolio.  The Court's finding is also based on its own credibility determination from observing the testimony itself

43.     Mr. Katzman testified that the value of the Lien Portfolio is approximately $3.07 million. The Court finds Mr. Katzman's testimony to be credible. Mr. Katzman is a licensed Florida attorney with substantial experience litigating HOA foreclosure actions in that state. He

1    provided clear reasons for each step of his calculations that were based on his experience. As

2    discussed below, the Court also agrees with his interpretation of Florida law to the extent it is

3    relevant in this case.

4        44.    Therefore, the Court finds that the market value of the 2013 Receivables and

5    2014-15 Receivables that would be recoverable by the seller in a foreclosure sale is $3.07

6    million.

7        45.    Omni, PrenPoinciana, and Prentice have each noticed UCC collateral sales of the

8    personal property of First 100, LLC. See Kal-Mor's Mot. Prelim. Inj. Ex. 2, 3. Both Notices of

9    Sale list the 2013 and 2014-15 Receivables as the first assets to be sold.

10       46.    As found above, First 100 owes $3.5 million to Omni. First 100 owes a combined

11   $1.68 million to PrenPoinciana and Prentice. Both amounts are secured by First 100's interest in

12   the 2013 Receivables. If these receivables were sold by Omni and PrenPoinciana in a UCC

13   collateral sale, the proceeds would be insufficient to completely satisfy First 100's debt to Omni

14   as the first-position secured creditor, let alone to PrenPoinciana.

15

16       **III.    LEGAL STANDARD**

17       A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

18   clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council,

19   Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four

20   elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer

21   irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its

22   favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. &

23   Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing

24   Winter, 555 U.S. 7, 20 (2008)). A preliminary injunction may issue under the "serious questions"

25   test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the

26   continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a

27   preliminary injunction by demonstrating "that serious questions going to the merits were raised

28   and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter

elements. Id. at 1134-35 (citation omitted).

Where (as here) the Court's jurisdiction is based on diversity of citizenship, the Court must apply state law regarding the availability of preliminary injunctive relief rather than federal law if the state law is outcome-determinative. Sims Snowboards, Inc. v. Kelly, 863 F.2d 643, 646-47 (9th Cir. 1988). This is because "a federal court adjudicating a State-created right solely because of diversity of citizenship is for that purpose, in effect, only another court of the State," and therefore cannot "substantially affect the enforcement of the right as given by the State." Id. (quoting Guaranty Trust Co. v. York, 326 U.S. 99, 108-09 (1945)). In this case, the Court need not apply state law standards because it concludes that doing so would not be outcome-determinative; as discussed below, First 100, Kal-Mor, and GFY would not be entitled to preliminary injunctive relief under federal or state law.

## IV.    CONCLUSIONS OF LAW

The Court concludes that First 100, Kal-Mor, and GFY have not satisfied their burden of establishing the requirements of a preliminary injunction in this case. Accordingly, the Court denies both preliminary injunction motions and will discuss each in turn. The Court also finds that the parties did not enter into a valid and binding settlement agreement at the February 2, 2016 hearing because the parties did not agree to all material terms. Thus, First 100's Motion to Enforce Settlement Agreement is denied.

### A.  First 100's Motion for Preliminary Injunction

Applying the Winter factors, the Court finds that First 100 is not entitled to a preliminary injunction under federal law. First 100 is similarly not entitled to an injunction under Nevada law. As will be shown below, First 100 has not established a likelihood of success on the merits on its state law claims, nor has it shown a likelihood of irreparable harm even as that term is defined under Nevada law. Therefore, as the application of state law would not be outcome-determinative, the Court analyzes only the federal standards.

#### 1.  Likelihood of Success on the Merits

First 100 asserts four causes of action in its Complaint: breach of contract, unjust

1   enrichment, declaratory relief, and permanent injunctive relief. First 100 has not established that

2   it is likely to succeed on any of these claims.

3          *a.   Breach of Contract*

4       Under Nevada law, breach of contract is "a material failure of performance of a duty

5   arising under or imposed by agreement." <u>Bernard v. Rockhill Dev. Co.</u>, 734 P.2d 1238, 1240

6   (1987). A breach of contract claim requires (1) the existence of a valid contract, (2) a breach by

7   the defendant, and (3) damage as a result of the breach. <u>Richardson v. Jones</u>, 1 Nev. 405, 409

8   (1865); <u>Rivera v. Peri & Sons Farms, Inc.</u>, 735 F.3d 892, 899 (9th Cir. 2013) (citing <u>Richardson</u>).

9   When facts are not in dispute, contract interpretation is a question of law for the court. <u>Lehrer</u>

10  <u>McGovern Bovis, Inc. v. Bullock Insulation, Inc.</u>, 197 P.3d 1032, 1041 (Nev. 2008).

11      First 100's breach of contract claim is focused on the Forbearance Agreement, in which

12  Omni agreed not to foreclose on the collateral identified in the Security Agreement. First 100 is

13  not likely to prevail on this claim. By its own terms, the Forbearance Agreement does not take

14  effect until all conditions precedent have been "fully and strictly satisfied," including the

15  requirement that First 100 pay $270,500. At a hearing held on January 20, 2016, First 100

16  conceded that it had not made the $270,500 payment. Therefore, First 100 has not shown that it

17  satisfied this condition precedent that would trigger Omni's forbearance obligation. <u>See Goldston</u>

18  <u>v. AMI Investments, Inc.</u>, 655 P.2d 521, 523 (Nev. 1982) ("[W]here a party is in default of

19  obligations which must be performed prior to the performance by the other party becoming due,

20  the first party is not entitled to claim a default by the second."). In addition, the Court finds that

21  Omni is not in breach of the Forbearance Agreement. Consequently, First 100 has not established

22  a likelihood of success on this claim.

23      Similarly, to the extent First 100 asserts a claim against PrenPoinciana for breach of the

24  PPSA, the Court finds that First 100 has not established that it is likely to succeed on such a

25  claim. While First 100 argues that PrenPoinciana is not authorized to foreclose under the PPSA,

26  the Court disagrees. In the PPSA, First 100 explicitly granted a security interest to PrenPoinciana

27  in the 2013 Receivables. Under Nevada law, a security interest need not take a particular form.

28  N.R.S. 104.9109(1)(a). Nevada law clearly permits a secured party to foreclose to enforce its

1   security interest upon default. N.R.S. 104.9601(1)(a). Therefore, First 100 has not demonstrated

2   a likelihood of success on the merits as to its breach of contract claim against PrenPoinciana.[2]

3                                    *b.   Unjust Enrichment*

4          As an initial matter, the Court finds that Nevada law applies to First 100's unjust

5   enrichment claim. "A federal court sitting in diversity ordinarily must follow the choice-of-law

6   rules of the State in which it sits." Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court, 134 S.Ct.

7   568, 582 (2013). In Nevada, actions based in restitution "are determined by the local law of the

8   state which, with respect to that issue, has the most significant relationship to the occurrence and

9   the parties . . . ." Rest. (Second) of Conflict of Laws § 221(1); Gen. Motors Corp. v. Eighth

10  Judicial Dist. Court, 134 P.3d 111, 116 (Nev. 2006) (applying the Restatement's "most

11  significant relationship" test); Certified Fire Protection, Inc. v. Precision Construction, 283 P.3d

12  250, 257 (Nev. 2012) (in Nevada, unjust enrichment is premised on a theory of restitution).

13  Courts are to balance several factors in making this determination, including (a) where the

14  parties' relationship was centered, (b) where the benefit was received, (c) where the act

15  conferring the benefit or enrichment was performed, (d) the domicile, residence, and place of

16  business of the parties, and (e) the location of any land or chattel connected to the enrichment.

17  Rest. (Second) § 221(2). Here, First 100's unjust enrichment claim is premised on Omni and

18  PrenPoinciana receiving a benefit in Nevada from a foreclosure sale conducted in Nevada.

19  Additionally, First 100 is a Nevada LLC. While the final factor favors applying Florida law, the

20  balance of these factors supports the application of Nevada law.

21         In Nevada, unjust enrichment is a theory of restitution in which a plaintiff confers a

22  benefit and seeks payment of "as much as he ... deserve[s]" for that benefit. Certified Fire

23  Protection, 283 P.3d at 257 (alteration in original). "Unjust enrichment exists when the plaintiff

24  _____

25         [2] The Court recognizes that the PPSA states that "[a]ll issues concerning this agreement
       shall be governed by and construed in accordance with the laws of the State of Delaware." PPSA
26     § 13, PrenPoinciana Ex. A. Applying Delaware law to First 100's breach of contract claim
       against PrenPoinciana would not change the result. See 6 Del. C. § 9-203(b) (a security interest
27     is enforceable against the debtor if value has been given, the debtor has the power to transfer
       rights in the collateral to the secured party, and "the debtor has authenticated a security
28     agreement that provides a description of the collateral"); id. § 9-601 (after default, a secured
       party "may reduce a claim to judgment, foreclose, or otherwise enforce" the security interest "by
       any available judicial procedure").

confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment for the value thereof." Id. internal quotation marks omitted). The benefit conferred "can include services beneficial to or at the request of the other, denotes any form of advantage, and is not confined to retention of money or property." Id. (internal quotation marks omitted).

Here, First 100 has not demonstrated it is likely to succeed in its unjust enrichment claim. First 100 has not shown that it has conferred, or is at imminent risk of conferring, a benefit on Omni and PrenPoinciana for which retention without payment would be inequitable. As set forth in detail above, the Court finds the value to Omni and PrenPoinciana of the 2013 and 2014-15 Receivables to be $3.07 million. First 100 owes $3.5 million to Omni, which is secured by the Collateral as that term is defined in the Security Agreement. First 100 also owes a combined $1.68 million to PrenPoinciana and Prentice, which is secured by First 100's interests in the 2013 Receivables. The Court does not find that the value of the other categories of personal property Omni seeks to sell at the UCC collateral sale would exceed the debt owed to Omni. Therefore, First 100 has not established that Omni and PrenPoinciana could even recover the full amounts they are owed by First 100 through the scheduled collateral sale, much less be unjustly enriched by the sale.

### c. Declaratory Relief

In Nevada, "[a]ny person . . .  whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." N.R.S. 30.040. First 100 advances four arguments for why it is likely to succeed on the merits of its declaratory relief claim, none of which are availing. The first argument is that no party has disputed the validity of the Forbearance Agreement and that Defendants have no right to foreclose on collateral not listed in that agreement. As discussed above, however, First 100 was obligated to pay Omni a sum of $270,500 as a condition precedent to the Forbearance Agreement taking effect. First 100

1    concedes that it did not make this payment, and thus has not established that Omni is bound by

2    this agreement.

3            Second, First 100 argues that the collateral sale as noticed would be void as commercially

4    unreasonable under N.R.S. 104.9610. This statute provides that "[e]very aspect of a disposition

5    of collateral, including the method, manner, time, place and other terms, must be commercially

6    reasonable." N.R.S. 104.9610(2). "The conditions of a commercially reasonable sale should

7    reflect a calculated effort to promote a sales price that is equitable to both the debtor and the

8    secured creditor. The quality of the publicity, the price obtained at the auction, [and] the number

9    of bidders in attendance are important factors to consider when analyzing the commercial

10   reasonableness of a public sale." Dennison v. Allen Grp. Leasing Corp., 871 P.2d 288, 291 (Nev.

11   1994) (citations and internal quotation marks omitted) (alteration in original). "A wide

12   discrepancy between the sale price and the value of the collateral compels close scrutiny into the

13   commercial reasonableness of the sale." Levers v. Rio King Land & Inv. Co., 560 P.2d 917, 920

14   (Nev. 1977). First 100 contends that the proposed collateral sales would be commercially

15   unreasonable because no one knows what is being bought or sold and because the sale price of

16   the 2013 and 2014-15 Receivables is unlikely to reflect the true value of these assets. Neither

17   contention has merit. The most recent notices of sale prepared by Omni and PrenPoinciana list

18   the assets to be sold with considerable specificity. See Kal-Mor's Mot. Prelim. Inj. Ex. 2 (listing

19   eight separate categories of assets to be sold); id. Ex. 3 (listing three separate categories).

20   Further, First 100 has not established that the 2013 and 2014-15 Receivables are worth anything

21   beyond the $3.07 million testified to by Mr. Katzman. Therefore, First 100's commercial

22   unreasonableness argument fails.

23           Third, First 100 argues that PrenPoinciana has no secured interest enabling it to foreclose

24   on First 100's collateral. For the reasons discussed in Section IV.A.1.a above, First 100 has not

25   shown it is likely to succeed on this argument.

26           Fourth, First 100 contends that Omni's notice of sale is overly broad in that it seeks to

27   foreclose on property of First 100 that was not pledged as collateral. But First 100 has made no

28   showing that it pledged anything less to Omni than what was defined as "Collateral" in the

1    Security Agreement—namely, "all of [First 100's] present and future right, title and interest in

2    and to *any and all of the personal property* of [First 100], *whether such property is now existing*

3    *or hereafter created, acquired or arising* and wherever located from time to time." Security

4    Agreement § 1.2, Omni Ex. 5 (emphasis added). Omni is therefore entitled to enclose on such

5    personal property to the extent it is owned by First 100.

6                                            *d.   Permanent Injunction*

7           First 100's final cause of action is for permanent injunctive relief. For the same reasons it

8    is not entitled to a preliminary injunction, First 100 has not shown a likelihood that it will prevail

9    on the merits of this claim.

10                                       **2.   Likelihood of Irreparable Harm**

11          Under the second <u>Winter</u> factor, a plaintiff seeking a preliminary injunction must

12   establish a likelihood—not just a possibility—of irreparable harm. <u>Winter</u>, 555 U.S. at 22. Where

13   (as here) a right of action arises under state law, the question of whether an injury is capable of

14   redress through money damages is also governed by state law. See <u>Clausen v. M/V New Carissa</u>,

15   339 F.3d 1049, 1064-65 (9th Cir. 2003) (finding a right to damages accruing to prevailing

16   plaintiffs under a state statute to be substantive, because "the question of the proper measure of

17   damages is inseparably connected with the right of action") (internal quotation marks omitted);

18   <u>see also</u> <u>Eagle Investors v. Bank of America</u>, 585 F. App'x 742, 742 (9th Cir. 2014) (holding, in

19   an unpublished and non-precedential decision, that the district court erred in finding no showing

20   of a likelihood of irreparable harm and that "[w]here, as here, a right of action arises under state

21   law, state law must also govern the extent to which damages are available to vindicate that

22   right.").

23          Applying Nevada law to this element, the Court finds that First 100 has not established a

24   likelihood of irreparable harm absent an injunction.[3] Each of First 100's two arguments with

25   respect to this element are without merit. First 100's first argument relies on the faulty premise

26   that the HOA receivables constitute interests in real property. First 100 cites to <u>Dixon v.</u>

27   _____

28          [3] The Court finds that First 100 has not established the irreparable harm requirement
     under federal law either, but since Nevada law is more expansive than federal law regarding
     what constitutes irreparable harm, the Court need not engage in that additional analysis.

Thatcher for the proposition that "real property and its attributes are considered unique and loss of real property rights generally results in irreparable harm." 742 P.2d 1029, 1030 (Nev. 1987). But First 100 has not shown that its HOA receivables constitute "real property rights." First 100 contends that it is able to foreclose on the properties connected to the delinquent assessment accounts for which it holds a beneficial interest and that it would be able to obtain free and clear title to these properties, extinguishing the interests of even first-priority mortgage holders. This is contradicted by the Court's review of Florida law.

In Florida, an HOA has a lien on each parcel of property to secure the payment of unpaid assessments and certain other amounts when the HOA's governing documents authorize such a lien. Fla. Stat. § 720.3085(1). Normally, the HOA's lien is effective from the date the original declaration of the community was recorded. Id. "However, as to first mortgages of record, the [HOA's] lien is effective from and after recording of a claim of lien in the public records of the county in which the parcel is located." Id. A "claim of lien" must be filed at the time assessments are due and owing. Id. § 720.3085(1)(a). Nevertheless, if both the declaration and mortgage were recorded before July 1, 2008, the HOA's lien could still date back to the recording of the governing documents and take priority over the mortgage if (1) the HOA's governing documents authorized liens for unpaid assessments, and (2) the governing documents clearly stated that such liens were superior to later-recorded mortgages. Id. § 720.3085(1); Ass'n of Poinciana Villages v. Avatar Props., Inc., 724 So.2d 585, 587 (Fla. Dist. Ct. App. 1998). At the preliminary injunction hearing, Mr. Bloom testified that APV's governing documents were amended in 2000 or 2001 to subordinate the HOA's lien to first mortgages. Therefore, First 100 has not demonstrated the existence of any mechanism under Florida law by which it could take title to APV properties and extinguish the first mortgages on the properties. First 100 has no greater right with respect to the properties in its Lien Portfolio than any prospective buyer at the HOA foreclosure sale would: the right to bid at the auction and acquire the property subject to the bank's mortgage. This is insufficient to establish the type of "real property rights" that may be subject to injunctive relief under Nevada law.

First 100's second proposed basis for irreparable harm comes from Sobol v. Capital

Mgmt. Consultants, Inc., in which the Nevada Supreme Court stated that "acts committed without just cause which unreasonably interfere with a business or destroy its credit or profits, may do an irreparable injury and thus authorize issuance of an injunction." 726 P.2d 335, 337 (Nev. 1986). Sobol does not support the issuance of an injunction in this case. Sobol contemplated the issuance of an injunction where the acts in question not only interfered with the plaintiff's business, but were "committed without just cause." Id. Immediately after this passage, the Nevada Supreme Court cited to its previous decision in Guion v. Terra Marketing of Nev., Inc., 523 P.2d 847 (Nev. 1974). In Guion, the Court explained that this equitable principle is aimed at restraining tortious acts. Id. at 848. Here, Omni's and PrenPoinciana's act of seeking to conduct a UCC collateral sale is neither tortious nor "committed without just cause." On the contrary, the evidence clearly demonstrates that First 100 is in breach of the Loan Agreement and the PPSA, that Omni and PrenPoinciana are entitled to foreclose under the relevant agreements, and that the assets sold at the collateral sale will likely not even satisfy the debts owed to them. Thus, First 100 has not shown a likelihood of irreparable harm.

As First 100 has not established a likelihood of success on the merits or irreparable harm, the Court does not address the application of the remaining Winter factors.

**B. First 100's Motion to Enforce Settlement Agreement**

It is "well established" that a trial court has the inherent power "to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it." In re City Equities Anaheim, Ltd., 22 F.3d 954, 957 (9th Cir. 1994). In May v. Anderson, the Nevada Supreme Court aptly laid out what is required for a valid and enforceable settlement agreement:

> Because a settlement agreement is a contract, its construction and enforcement are governed by principles of contract law. Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration. With respect to contract formation, preliminary negotiations do not constitute a binding contract unless the parties have agreed to all material terms. A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite. A contract can be formed, however, when the parties have agreed to the material terms, even though the contract's exact language is not finalized until later. In the case of a settlement agreement, a court

cannot compel compliance when material terms remain uncertain. The court must be able to ascertain what is required of the respective parties.

119 P.3d 1254, 1257 (Nev. 2005). Thus, the key inquiry for First 100's Motion to Enforce Settlement Agreement is whether the parties agreed to all material terms at the February 2, 2016 hearing. In order to be considered "material," a contract term must not be a "mere formality," but rather should constitute "an important reason why a party enters into a settlement agreement." Id. at 1258. Determining the material or essential terms is a fact-intensive inquiry that "depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought." Certified Fire Protection, 283 P.3d at 255 (quoting Restatement (Second) of Contracts § 131 cmt. g (1981)).

The Court finds that the parties did not enter into an enforceable contract at the February 2 hearing. The context of the agreement and the parties' subsequent conduct of the parties clearly indicate that there was no complete meeting of the minds at the February 2 hearing. All of the draft agreements exchanged after the hearing, as well as the previous contracts entered into among the same parties, demonstrate that this was a highly complex settlement agreement with many moving parts. The parties exchanged at least five full draft settlement agreements over a period of more than a month before negotiations broke down. The communications exchanged indicate that these negotiations were not surprising to anyone; rather, the parties fully anticipated going back and forth on different terms in the proposed agreement. The drafts exchanged by the parties reveal that they continued to have substantial disagreements on certain terms after the hearing, particularly with respect to the flow of managerial control of the Lien Portfolio and First 100's obligations to cure deficiencies in its deeds of trust for certain parcels of Nevada real property. The level of detail contained in the terms read into the record on February 2, 2016 is much simpler (but not clearer) than that of the parties' earlier written agreements or the drafts exchanged following the hearing. Based on these facts, the Court concludes that the parties did not agree to all material terms on the record on February 2.

Moreover, even if the terms agreed to on February 2 were sufficient to constitute a binding settlement agreement, the Court would find that First 100 is no longer entitled to seek enforcement of that agreement. A material breach by one party to a contract may excuse further

1    performance by another party to the contract. See Young Elec. Sign Co. v. Fohrman, 466 P.2d

2    846, 847 (Nev.1970) ("Young Electric's duty to maintain the signs and rebuild in the event of

3    destruction existed only if the lessee was not in material default. The lessee's material breach in

4    failing to pay rent excused further performance by the lessor."). "[T]he party who commits the

5    first breach of a contract cannot maintain an action against the other for a subsequent failure to

6    perform." Bradley v. Nev.-Cal.-Or. Ry., 178 P. 906, 908–09 (Nev.1919); Samson v. NAMA

7    Holdings, LLC, 637 F.3d 915, 931 n.87 (9th Cir. 2010), as amended (Feb. 11, 2011) (citing

8    Bradley). Here, the parties agreed at the February 2, 2016 hearing that First 100 would "clean

9    up" any issues with the above-mentioned deeds of trust for four Nevada properties, including any

10   issues with tax liens. The evidence indicates that First 100 did not take that action and that tax

11   liens remain outstanding. The Court would therefore find this to be a material breach by First

12   100 that would preclude its enforcement of the settlement agreement. First 100's Motion to

13   Enforce Settlement Agreement is denied.

14                    **C.  Kal-Mor and GFY's Motion for Preliminary Injunction**

15          Finally, Kal-Mor has not demonstrated that it is entitled to a preliminary injunction under

16   either federal or state law. As the application of state law would not be outcome-determinative,

17   the Court only analyzes the federal standard.

18                              *1.  Likelihood of Success on the Merits*

19          Kal-Mor and GFY's motion is premised on eight causes of action alleged in their

20   Complaint: declaratory relief, fraud, conspiracy/concert of action, breach of contract/detrimental

21   reliance, breach of the implied covenant of good faith and fair dealing, unjust enrichment,

22   injunctive relief, and tortious interference with contractual relations. Each of the causes of action

23   are connected by the same underlying facts. Kal-Mor and GFY assert that the parties entered into

24   a binding settlement agreement on the record at the February 2, 2016 hearing and that, in reliance

25   on this agreement, Mr. Darroch (managing member of both Kal-Mor and GFY) wired

26   approximately $710,000 to APV to purchase the 2014-15 Receivables. Kal-Mor and GFY allege

27   that by seeking to foreclose on these receivables, Omni and PrenPoinciana either breached the

28   settlement agreement or, if no agreement was reached, fraudulently led Darroch to believe that

such an agreement existed in order to deprive Kal-Mor and GFY of the receivables.

As an initial matter, the Court addresses which law to apply to these claims. The parties do not dispute that Nevada law applies to all eight causes of action, and the Court agrees. To determine which state's law to apply in tort claims, Nevada applies the Second Restatement's "most significant relationship" test. Gen. Motors Corp. v. Eighth Judicial Dist. Court, 134 P.3d 111, 116 (Nev. 2006). Under this test, "the rights and liabilities of parties with respect to an issue in tort are governed by the local law of the state that, 'with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Section] 6'" of the Second Restatement. Id. (quoting Rest. (Second) of Conflict of Laws § 145). To determine which state's law to apply to contract claims, Nevada uses the "substantial relationship" test. Consol. Generator-Nev., Inc. v. Cummins Engine Co., Inc., 971 P.3d 1251, 1253 (Nev. 1998). To determine whether a state possesses a substantial relationship with a contract, courts consider five factors: "[1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and [5] the domicile, residence, nationality, place of incorporation and place of business of the parties." Id. at 1253-54. Additionally, applying another state's law must not violate a strong public policy of Nevada. Id. at 1254.

While Kal-Mor and GFY assert eight causes of action, each one involves a purported agreement that was entered into and negotiated in Nevada and that involved multiple Nevada entities (First 100 and Kal-Mor). While much of the subject matter of the contract was located in Florida, certain obligations of the purported agreement were to be performed in Nevada. Therefore, the Court finds that both the "most significant relationship" test (for the tort claims) and the "substantial relationship" test (for the contract claims) favor application of Nevada law.

Applying Nevada law to these claims, the Court finds that Kal-Mor and GFY have not established a likelihood of success on the merits. The Court finds that Defendants did not act fraudulently or induce Darroch to detrimentally rely on their representations regarding the settlement agreement and the funding of the 2014-15 Receivables. On the contrary, the Court finds that GFY purchased the 2014-15 Receivables in reliance on the Second PPSA with First

1   100 and not on the purported settlement agreement.

2        Kal-Mor and GFY argue that Mr. Boone, managing member of Omni, was in constant

3   contact with Mr. Darroch as he prepared to fund the 2014-15 Receivables and that Mr. Boone

4   never notified Mr. Darroch of Omni's intention to nonetheless sell the 2014-15 Receivables after

5   they were funded. This is directly contradicted by the evidence presented at the preliminary

6   injunction hearing. On March 11, 2016—one week before the funding of the 2014-15

7   Receivables—counsel for Omni provided written notice to Kal-Mor's counsel that if the parties

8   did not execute and return the attached settlement agreement by March 16, Omni would consider

9   the settlement negotiations dead and reserved its right to proceed with foreclosure. Neither Omni

10  nor PrenPoinciana made false representations to Mr. Darroch with the intention of inducing him

11  to purchase the 2014-15 Receivables so that Omni and PrenPoinciana could foreclose on them. It

12  therefore follows that Omni and PrenPoinciana did not engage in a conspiracy or concert of

13  action to commit such fraud or induce such reliance.

14       Kal-Mor and GFY also have not demonstrated that they are likely to succeed on their

15  contract-based claims or their claims for unjust enrichment or tortious interference with

16  contractual relations. As discussed in Section IV.B above, the Court does not find that a valid

17  and enforceable settlement agreement was formed on February 2, 2016. Therefore, Kal-Mor and

18  GFY's breach of contract claim, which is predicated on the existence of a valid settlement

19  agreement, fails at this stage. Similarly, the Court has previously found in Section IV.A that the

20  assets on which Omni and PrenPoinciana seek to foreclose are insufficient to satisfy the amounts

21  they are allegedly owed, and therefore they will not be unjustly enriched by the collateral sale.

22  To the extent that Kal-Mor and GFY allege that it would be wrongful for Omni and

23  PrenPoinciana to foreclose on assets belonging to them and *not* to First 100, they are correct.

24  However, the notices of sale specifically state that Omni and PrenPoinciana are only seeking to

25  foreclose on personal property belonging to First 100, not Kal-Mor or GFY. The Court therefore

26  does not find that Kal-Mor or GFY will be deprived of whatever interests they own in the 2014-

27  15 Receivables through the UCC collateral sale. Therefore, they have not established likelihood

28  of success on their unjust enrichment claim.

1    Finally, to establish a claim for tortious interference with contractual relations, the
2    plaintiff must establish "(1) a valid and existing contract; (2) the defendant's knowledge of the
3    contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4)
4    actual disruption of the contract; and (5) resulting damage." J.J. Indus., LLC v. Bennett, 71 P.3d
5    1264, 1267 (Nev. 2003). Kal-Mor and GFY assert that the contractual relationship at issue was
6    the one between GFY and APV to purchase the 2014-15 Receivables. Crucially, Kal-Mor and
7    GFY have not established the third element: intentional acts by Omni or PrenPoinciana designed
8    to disrupt that contractual relationship. Based on the evidence presented, the Court finds that
9    Omni and PrenPoinciana's objective in foreclosing on the HOA receivables is to recover the debt
10   owed to them, not to interfere with GFY's contractual relationship with APV. The fact that Omni
11   did not stop Darroch from purchasing the 2014-15 Receivables is not enough to establish this
12   element—particularly where Omni sent written notice of its intent to pursue foreclosure if no
13   settlement agreement was signed and returned, which it was not. Thus, Kal-Mor and GFY have
14   not established the first Winter factor.

15                          ***2.   Likelihood of Irreparable Harm***

16   Kal-Mor and GFY have also failed to establish a likelihood of irreparable harm. As the
17   Court discussed in Section IV.A above, under Florida law, the right to receive proceeds from
18   delinquent assessment account receivables does not give the interest holder the right to acquire
19   real property beyond what any individual or entity at the public foreclosure auction would
20   possess. There is no mechanism under Florida law for an HOA foreclosure on an APV home to
21   extinguish a first mortgage directly and obtain title without a public auction. Therefore, Kal-Mor
22   and GFY cannot establish irreparable harm on the basis of injury to real property rights.

23   Kal-Mor and GFY likewise have not established irreparable harm under the Nevada
24   Supreme Court's decision in Sobol. As discussed in the previous section, the Court finds that
25   Omni and PrenPoinciana have not committed, nor is there imminent danger of them committing,
26   tortious acts or acts committed "without just cause" that would justify injunctive relief.
27   Therefore, Kal-Mor and GFY cannot establish the second Winter factor.

28   As with First 100's motion, Kal-Mor and GFY have failed to establish either of the first

1  two mandatory <u>Winter</u> factors. Therefore, the Court declines to consider the remaining factors.

2  Kal-Mor and GFY's Motion for Preliminary Injunction is denied.[4]

3  ### D.  Sale of Additional Personal Property of First 100

4  Finally, in its motion, First 100 argues that the Omni Loan was secured only by the 2013

5  Receivables, and therefore Omni cannot foreclose on any other property of First 100. First 100

6  also contends that Omni cannot choose which collateral it will foreclose upon and that its ability

7  to foreclose on the 2014-15 Receivables was foreclosed by the Forbearance Agreement.

8  In its Notification of Disposition of Collateral noticing a sale for April 12, 2016, Omni

9  specified eight separate sales that would occur. The collateral of First 100 to be sold in these

10  sales was specified as follows: (1) the 2013 Receivables; (2) the 2014, 2015, and 2016

11  Receivables; (3) all other HOA liens or receivables; (4) accounts, deposit accounts, and cash; (5)

12  office equipment; (6) choses in action; (7) accounts receivable, notes, and obligations due to First

13  100; and (8) a "catch-all" sale of all of First 100's present right, title, and interest in its existing

14  personal property.

15  The Court rejects First 100's argument that the Omni Loan was secured only by the 2013

16  Receivables. As discussed in IV.A.1 above, in the Security Agreement, First 100 pledged as

17  collateral "all of [First 100's] present and future right, title and interest in and to *any and all of*

18  *the personal property* of [First 100], *whether such property is now existing or hereafter created,*

19  *acquired or arising* and wherever located from time to time." Security Agreement § 1.2, Omni

20  Ex. 5 (emphasis added). It is therefore clear that First 100 pledged more than the 2013

21  Receivables as collateral for the Omni Loan.

---

23  [4] The Court also notes that there is a separate basis for denying Kal-Mor and GFY

24  injunctive relief based upon their intentional withholding of crucial documents during this preliminary injunction proceeding.  A party which comes to a court in equity seeking equitable

25  relief may not obtain such relief where it has engaged in improper conduct in the course of the equitable proceeding. <u>See</u> <u>Adler v. Fed. Republic of Nigeria</u>, 219 F.3d 869, 876-77 (9th Cir.

26  2000), <u>as amended on denial of reh'g and reh'g en banc</u> (Aug. 17, 2000) ("The unclean hands doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith

27  relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.' Under this doctrine, plaintiffs seeking equitable relief must have 'acted fairly and

28  without fraud or deceit as to the controversy in issue.'") (internal citations omitted). Given the Court's denial of the motion on other grounds, the Court need not elaborate on this equitable consideration at this time.

1    First 100's argument that Omni could not choose which property it sought to foreclose

2    upon also must fail. This argument is foreclosed by Nevada law, which clearly states that "[a]fter

3    default, a secured party may sell, lease, license or otherwise dispose of *any or all of the*

4    *collateral* in its present condition" and that "[i]f commercially reasonable, a secured party may

5    dispose of collateral . . . by one or more contracts, as a unit or in parcels, and at any time and

6    place and on any terms." N.R.S. 104.9610(1), (2).

7    Lastly, First 100's reference to the Forbearance Agreement is unavailing. As discussed in

8    Section IV.A.1 above, First 100 did not make the $270,500 payment that was a condition

9    precedent to Omni's forbearance obligation. The Court does not find that Omni's capacity to

10   foreclose is limited by the Forbearance Agreement.

11   Notwithstanding the above, the Court emphasizes that this Order does not address the

12   value of any of the categories of sales listed in Omni's notice of sale other than the 2013, 2014,

13   and 2015 Receivables, nor does this Order address whether Omni or PrenPoinciana are entitled

14   to foreclose on any other personal property listed in their notices of sale other than the 2013,

15   2014, and 2015 Receivables.

16   First 100 has focused exclusively on the 2013, 2014, and 2015 Receivables as the assets

17   which cannot be foreclosed upon.  Other than what has been noted, First 100 has not presented

18   any evidence at the hearing on the valuation or impropriety of the sale of other assets mentioned

19   in the foreclosure sale notice.  The Court therefore understands First 100 not to be contesting

20   these other noticed assets, since they have not presented evidence or argument against their sale.

21

22   **V.    CONCLUSION**

23   For the reasons discussed above,

24   **IT IS ORDERED** that Plaintiff First 100, LLC's Motion for Preliminary Injunction

25   (ECF No. 16 in case no. 2:16-cv-99-RFB-CWH) is DENIED.

26   **IT IS FURTHER ORDERED** that Plaintiff First 100, LLC's Motion to Enforce

27   Settlement Agreement (ECF No. 44 in case no. 2:16-cv-99-RFB-CWH) is DENIED.

28

**IT IS FURTHER ORDERED** that Plaintiff Kal-Mor-USA, LLC and GFY Management LLC's Motion for Preliminary Injunction (ECF No. 13 in case no. 2:16-cv-109-RFB-CWH) is DENIED.

DATED: May 23, 2016.

                                                _____

**RICHARD F. BOULWARE, II**
**United States District Judge**